UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

- - - -

**CERTIFIED COPY**

| | |
|---|---|
| UNITED STATES OF AMERICA,   )<br>                              )<br>         PLAINTIFF,           )<br>                              )<br>    vs.                       )<br>                              )<br>SCOTT J. ALGUIRE and          )<br>PHILLIP L. COOPER,            )<br>                              )<br>         DEFENDANTS.          )<br>_____) | No. CR 13-706(A)-RGK |

REPORTER'S PARTIAL TRANSCRIPT OF JURY TRIAL

(GOVERNMENT'S OPENING STATEMENT)

TUESDAY, MAY 6, 2014

1:31 P.M.

LOS ANGELES, CALIFORNIA

_____

*SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR*
*Official Reporter, U.S. District Court*
*255 East Temple Street*
*Los Angeles, CA  90012*
*213.894.5949*

```
 1   APPEARANCES OF COUNSEL:

 2


 3   FOR PLAINTIFF UNITED STATES OF AMERICA:

 4          ANDRE BIROTTE, JR., UNITED STATES ATTORNEY
            BY:  LAWRENCE S. MIDDLETON, ASSISTANT U.S. ATTORNEY
 5               DOUGLAS M. MILLER, ASSISTANT U.S. ATTORNEY
            312 NORTH SPRING STREET
 6          LOS ANGELES, CALIFORNIA  90012
            213.894.5010
 7          213.894.2216

 8


 9   FOR DEFENDANT PHILLIP L. COOPER:

10          STANLEY I. GREENBERG, A LAW CORPORATION
            BY:  STANLEY I. GREENBERG, ATTORNEY AT LAW
11               EVAN GREENBERG, ATTORNEY AT LAW
            11845 WEST OLYMPIC BOULEVARD, SUITE 1000
12          LOS ANGELES, CALIFORNIA  90064-5024
            424.248.6600

13

14   FOR DEFENDANT SCOTT J. ALGUIRE:

15          MICHAEL B. CLAYTON & ASSOCIATES
            BY:  WILLIAM L. REDELL, ATTORNEY AT LAW
16          400 EAST ORANGE STREET
            SANTA MARIA, CALIFORNIA  93454
17          805.928.5353

18


19   ALSO PRESENT:

20            ALEXANDER LOMVARDIAS

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

I N D E X

*GOVERNMENT'S OPENING STATEMENT*                   *4*

E X H I B I T S

(None herein)

1          LOS ANGELES, CALIFORNIA; TUESDAY, MAY 6, 2014
2                           1:31 P.M.
3                            - - - -
4       *(Prior proceedings were reported in this matter;*
5       *not transcribed herein.)*
6       *(In the presence of the jury:)*
7            THE COURT: Okay. The record will reflect that all
8  the members of the jury are in their respective seats in the
9  jury box.
10      I hope you're ready to get started now. Now we get to
11 that part that you'll be interested in. That's the
12 presentation of the opening statement and then into the
13 witnesses themselves.
14      Remember what I said before, that counsel, when they make
15 their opening statement, are trying to give you a roadmap of
16 where the trial's going so you can understand the evidence as
17 it comes in bit by bit. It's not evidence itself, it's just
18 kind of to help you as kind of a roadmap, and they will be
19 arguing -- well, not arguing, but they'll be making statements
20 as to what they think the evidence is going to show.
21      Counsel.
22           MR. MILLER: Thank you, your Honor.
23      May I proceed?
24           THE COURT: Yes, please.
25           MR. MILLER: A police car. As drivers, we have come

1  to immediately identify this vehicle when we see it.  In fact,
2  if you've been driving for any length of time here in
3  California, this vehicle symbolizes so much.  As drivers, we
4  can spot this vehicle from great distances.  We can see it when
5  it's off to the side of the road, hiding in some bushes.  We
6  can see it when it's tucked in with hundreds of cars on a
7  crowded California highway.  We know what this vehicle is and
8  we know what it symbolizes, and we know that it comes in many
9  variations.  This vehicle is recognizable because of what it
10 stands for.
11     It's safe to say that the longer you've been driving, the
12 more this vehicle has come to symbolize to you.  If you've ever
13 been the victim of a car accident or found yourself stranded on
14 the side of the road late at night or your car broken down on a
15 busy highway, this car, this vehicle, may have come to
16 symbolize safety or protection.  But the one thing this
17 symbolizes, this vehicle symbolizes to every thing and person
18 that it comes into contact with, no matter who you are, no
19 matter how long you've been driving, no matter what the
20 circumstances may be, the one thing this vehicle symbolizes is
21 law enforcement, people acting on behalf of a state, a local,
22 or, in this case, the federal government, enforcing the laws of
23 that government.
24     As you can see in this photograph, the fact that this
25 vehicle symbolizes law enforcement is inescapable.  The words

1  "law enforcement" are emblazoned in large letters in the front
2  of the vehicle so that everyone who comes into contact with
3  this vehicle knows what it is, knows what it represents.
4       So why talk about the obvious?  Why spend so much time
5  going over what each of us as drivers know immediately when we
6  see this vehicle?  Why?
7       Because, as you will hear, the defendants in this case,
8  Mr. Cooper and Mr. Alguire, seated back there, agreed that they
9  would take advantage of what this vehicle so clearly represents
10 and symbolizes to the public, that they would pretend, or, as
11 the indictment charges, impersonate, by having Mr. Cooper act
12 as if he was law enforcement by driving this vehicle.
13      This agreement that they entered into, you will hear,
14 began to take shape in September of 2011.
15      Mr. Phillip Cooper and Mr. Scott Alguire both belong to an
16 Elks Lodge, an Elks Lodge that was located near Arroyo Grande,
17 California, and it was through their relationship at the
18 Elks Lodge that they decided that they were going to help out a
19 friend, a friend who was managing a private cattle ranch who
20 was having difficulty in that responsibility.
21      Now, at first glance, helping out a friend might seem like
22 a noble endeavor, but what you will hear is that there were two
23 critical flaws in the plan that these defendants both knew
24 existed at the time they entered into it that made their plan
25 illegal.

1       First, neither one of those defendants that I mentioned
2  owned the vehicle that you see in this picture, and therefore,
3  they had no authority to give it away, to loan it out, to let
4  someone borrow it.  It wasn't theirs to do.
5       Second, and I touched on this earlier, neither one of them
6  was law enforcement; therefore, neither one of them had the
7  authority to drive a vehicle that would so easily symbolize to
8  the public and the people it came into contact with that they
9  were law enforcement, because it wasn't true.  They were not.
10 Neither one of them.
11      It began in September of 2011.  You'll hear that
12 Mr. Alguire, seated in the back, worked for the United States
13 Forest Service.  But he didn't work there as a law enforcement
14 officer or as a police officer.  He works there as what's known
15 as a fleet manager.  A fleet manager.  That meant that he had
16 the responsibility of keeping track of the vehicles, including
17 the one you see photographed here, keeping track of the
18 vehicles on the Los Padres National Forest.  That's it.  He had
19 access to those vehicles, but he did not own them.  That access
20 and the position that he had as the fleet manager allowed
21 Mr. Alguire to learn something about this vehicle.  What he
22 learned was that this vehicle had been parked behind the
23 facility that he worked at and that no one was using it.  And
24 so Mr. Alguire took it upon himself, without consulting any
25 supervisors, without consulting any law enforcement officials

1  beforehand, took it upon himself to take this vehicle, drive it
2  over to that cattle ranch I mentioned earlier, and give it to
3  Mr. Cooper.
4       Now, you're going to hear from an individual named
5  Eddie McCaa.  He's going to be a witness that testifies for
6  you.  For the government, excuse me.  What Mr. McCaa will
7  explain to you is that almost immediately after Mr. Alguire
8  gave that vehicle to Mr. Cooper, Mr. Cooper and Mr. McCaa began
9  driving around near the Los Padres National Forest conducting
10 patrols.
11      We're going to call the victims, the people that
12 Mr. Cooper came into contact when he had this vehicle.  Those
13 victims are going to tell you three things that you should
14 focus on as you sit here.
15      First, although Mr. Cooper never activated the emergency
16 lights on that vehicle, or the siren, he took steps using that
17 vehicle to make it appear that he was law enforcement and to
18 stop them involuntarily while they were traveling near the
19 Los Padres National Forest.  The expression you might use is,
20 he "pulled them over."
21      The second thing they're going to tell you is that
22 Mr. Cooper, while pretending that he was law enforcement,
23 ordered them to produce identifying information for
24 identification.
25      The third thing they'll tell you is that if they knew that

1  Mr. Cooper was not law enforcement and that he should not have
2  been driving that vehicle, they would have never given him
3  their personal identifying information.  They did that because
4  of what he was pretending to be.
5      Now, I anticipate that as you hear the testimony of these
6  victims and the witnesses in this case, you're going to begin
7  to ask yourself, what were these two defendants thinking?
8  That's good.  And I want you to keep asking it during the
9  course of this trial.
10     Did Mr. Alguire think that because he was the fleet
11 manager that he could give away the keys to the police vehicle
12 you see in this photograph and let his buddy from the
13 Elks Lodge start driving it around?
14     Did Mr. Cooper think that his buddy from the Elks Lodge
15 could toss him the keys to this vehicle and he could go around
16 pulling people over, demanding identification?
17     I want you to keep asking yourselves those questions as
18 you hear the testimony.  And the evidence will show that the
19 answer to those questions is, absolutely not.  They knew what
20 they were doing was wrong.
21     Now, in addition to the testimony that you'll hear, you're
22 going to hear from people that worked with Mr. Cooper, and
23 you'll learn that he's not just some ordinary guy.  Mr. Cooper,
24 the guy that was driving around this vehicle, was someone who
25 had 30 years, 30 years in law enforcement.  Now, he had left

1  that position three years before any of this happened, so he
2  was no longer in law enforcement. But during that time, those
3  30 years, he had been trained over and over and over again
4  about the things that would have made it clear to him that what
5  he was doing was illegal, that this vehicle symbolized so much
6  to the public.
7      Let's talk about some of the things he learned during
8  those 30 years you're going to hear about.
9      You're going to hear that he had been trained that only
10 sworn law enforcement personnel could drive a vehicle, a police
11 vehicle, with these badges. The badges I'm talking about are
12 the sirens and the lights. Only sworn law enforcement.
13     You'll hear that if you're going to be armed as a police
14 officer, Mr. Cooper was trained, that your firearm had to be in
15 a holster, not, as you will find out, the way Mr. Cooper had
16 it, hanging out of his back pocket as he got out of the vehicle
17 to confront the people he was pulling over.
18     You're going to hear that Mr. Cooper was trained that you
19 had to have reasonable suspicion that the people you were
20 coming into contact with involuntarily had committed some kind
21 of crime or violation and that you just couldn't go around
22 willy-nilly pulling over virtually everyone you came into
23 contact with and demanding identification. Couldn't do it.
24 And he had been trained on that for over 30 years.
25     Most importantly, Mr. Cooper had been trained and knew

1  that if you were going to work for a law enforcement agency,
2  you had to take an oath of office, and your buddy from the
3  Elks Lodge couldn't just toss you the keys to a police car and
4  off you go.  There were certain procedures that had to be
5  followed if you were going to embark on what these defendants
6  embarked on, and they knew about it.
7       In addition to all this training, the most glaring piece
8  of evidence you're going to hear during this trial that
9  convince -- that will demonstrate that Mr. Cooper knew that
10 what he was doing was illegal is that, when he was confronted
11 by law enforcement and asked to explain what he was doing with
12 this vehicle, he lied.  He tried to make it sound innocent,
13 because he knew what the truth was.
14      For example, you'll hear that he told the police, the law
15 enforcement people investigating this case, that he never
16 pulled anybody over, stopped them involuntarily.
17      Well, you're going to hear from the victims.  You're going
18 to hear from the people who he stopped, who will make it very
19 clear, as I indicated before, they stopped because he told them
20 to.
21      He also lied and said that he never asked them to produce
22 any identification, that they would just see him and come
23 walking over and say, "Do you want to see my identification?"
24      Again, you're going to hear from the victims.  They will
25 say that the reason they produced their identification or

1   personal identifying information about themselves was because
2   that's what Mr. Cooper directed them to do, and, because they
3   thought he was law enforcement because of this vehicle and the
4   way that he was conducting himself and what he was saying, they
5   did it.
6        Ladies and gentlemen, these are the facts of this case,
7   and after you've heard them for yourself and you've seen the
8   witnesses and the victims that I mentioned, we're going to
9   stand back up and ask you to find the defendants in this case
10  guilty.  Guilty of conspiring to convert this vehicle you see
11  in this picture to their own use, guilty of conspiring to let
12  Mr. Cooper go around impersonating a federal law enforcement
13  officer, and guilty, in the case of Mr. Cooper, of lying when
14  confronted by law enforcement about it.
15       Thank you.
16            THE COURT:  Thank you, Counsel.
17
18       *(Further proceedings were reported in this matter;*
19       *not transcribed herein.)*
20
21                            *--oOo--*
22
23
24
25

```
 1                        CERTIFICATE

 2

 3       I hereby certify that pursuant to Section 753,

 4   Title 28, United States Code, the foregoing is a true and

 5   correct transcript of the stenographically reported proceedings

 6   held in the above-entitled matter and that the transcript page

 7   format is in conformance with the regulations of the

 8   Judicial Conference of the United States.

 9

10   Date:  MAY 7, 2014

11

12

13

14                      /S/ SANDRA MACNEIL_

15                      Sandra MacNeil, CSR No. 9013
```